# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| RICHARD D. PETERSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:10cv1866 TCM |
| | ) | |
| CORRECTIONAL MEDICAL | ) | |
| SERVICES, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This pro se 42 U.S.C. § 1983 action is before the Court[1] on the opposed motion of Defendants[2] for summary judgment. [Doc. 56]  The seventy-nine-page complaint at issue raises numerous claims of Eighth Amendment violations based on allegations of deliberate indifference to Richard D. Peterson's serious medical needs, including that he was denied needed, prescribed medication; denied referrals to medical specialists; and subjected to delayed treatment of his medical needs.  Peterson (Plaintiff) further alleges that defendant Correctional Medical Services (CMS) systematically directed its physician employees to delay and refuse medical treatment to inmates in order to increase its profits.

## Background

Plaintiff, a Missouri inmate, is presently confined at the Western Missouri Correctional Center (WMCC) and has also been confined at the Moberly Correctional Center

---

[1]The case is before the undersigned United States Magistrate Judge by written consent of the parties. See 28 U.S.C. § 636(c).

[2]Defendants are:  Correctional Medical Services; Elizabeth Conley, Regional Medical Director; William E. Rice, Medical Director; Glen S. Babich, Medical Director; Michael E. Sands, Assistant Regional Medical Director; Dr. Gene P. Roxas; Dr. Tomas V. Cabrera; Dr. Karl Saffo; and Dr. Milo Farnham.  Each individual defendant is sued his or her individual and official capacities.

(MCC) and Northeast Correctional Center (NCC).  (Defs. Stat. of Uncont. Mat. Facts[3] ¶ 1, ECF No. 58.)  He has been confined in Missouri since 1995, when he began serving a twenty-five year sentence.  (Id. ¶ 6.)  All the complained-of actions or omissions took place when Plaintiff was confined in the Missouri correctional system.

Plaintiff's allegations are primarily either of how his vascular conditions were treated or of how his renal conditions were treated.

Vascular Conditions.  On May 7, 2002, while at NCC, Plaintiff complained of circulation problems in his legs, predominantly in his left leg.  (Id. ¶ 7.)  He complained that

---

[3]Defendants' Statement of Uncontroverted Material Facts includes one hundred alleged facts, each supported by reference to specific portions of the record.  The Court will cite those statements as "Stat." where they are properly supported.

The Court notes that Plaintiff did not respond to Defendants' Statement.  Instead, he filed an eight-paragraph pleading titled "Plaintiff's Statement of Disputed Facts."

Local Rule 4.01E of the Eastern District of Missouri provides:

(E)  A memorandum in support of a motion for summary judgment shall have attached a statement of uncontroverted material facts, set forth in a separately numbered paragraph for each fact, indicating whether each fact is established by the record, and, if so, the appropriate citations.  *Every memorandum in opposition shall include a statement of material facts as to which the party contends a genuine issue exists.  Those matters in dispute shall be set forth with specific references to portions of the record, where available, upon which the opposing party relies.  The opposing party also shall note for all disputed facts the paragraph number from movant's listing of facts.  All matters set forth in the statement of the movant shall be deemed admitted for purposes of summary judgment unless specifically controverted by the opposing party.*

(Emphasis added.)

Plaintiff's response does not comply with this rule.  He does not set forth specific references to matters in dispute and does not specifically deny any of Defendants' Statements.  Rather, he simply refers to his voluminous exhibits without any page references.  Plaintiff's pro se status does not excuse him from responding to Defendants' motion "with specific factual support for his claims to avoid summary judgment," **Beck v. Skon**, 253 F.3d 330, 333 (8th Cir. 2001), or from complying with local rules, see **Schooley v. Kennedy**, 712 F.2d 372, 373 (8th Coir. 1983) (per curiam).  And, "[i]n ruling on a motion for summary judgment, [this Court] is not obligated to wade through and search the entire record for some specific facts which might support the nonmoving party's claim, rather the nonmoving party must designate the specific genuine issues of material fact that preclude summary judgment." **Holland v. Sam's Club**, 487 F.3d 641, 644 (8th Cir. 2007) (interim quotations omitted).

his legs were swollen and he could not walk. (Id.) He demanded to immediately be taken to see the physician, Dr. Hampton, in chronic care. (Id.) Instead, he was seen by a nurse, Lisa Leonard. (Id. ¶ 8.) He informed her that his left leg would swell after walking and that he had a burning pain in the back of his left knee and tightness in the left calf. (Id.) He advised her that sitting afforded relief and that, having watched "CNN," he was afraid of heart disease or a blood clot. (Id.) Ms. Leonard concluded that the swelling was not edema.[4] (Id.)

Six days later, Plaintiff was seen by Dr. Hampton about his leg issues. (Id. ¶ 9.) Dr. Hampton concluded that Plaintiff had peripheral vascular disease (PVD)[5] and requested a referral for an evaluation of Plaintiff's arterial supply in his legs; the referral was approved. (Id.) Dr. Hampton also advised Plaintiff that he needed to completely stop smoking. (Id.) Plaintiff was then smoking one-half pack of cigarettes a day. (Id.)

The following month, Plaintiff had an ultrasound of his legs. (Id. ¶ 10.)

Dr. Hampton saw Plaintiff in July in response to his complaints of pain in his left calf and numbness and pain in his legs when squatting. (Id. ¶ 11.) Plaintiff informed Dr. Hampton that he had reduced his smoking. (Id.) He was to follow-up with Dr. Hampton in three weeks, and did. (Id. ¶ 11-12.) At that visit, Plaintiff continued to complain about pain in his legs. (Id. ¶ 12.) Consequently, Dr. Hampton requested a referral for a arteriogram (a "[r]adiographic demonstration of an artery after injection of contrast medium"[6]). (Id.) After

---

[4]Edema is "[a]n accumulation of an excessive amount of watery fluid in cells, tissues, or serous cavities." Stedman's Medical Dictionary, 544 (26th ed. 1995) (Stedman's).

[5]PVD "is a condition of the blood vessels that leads to narrowing and hardening of the arteries that supply the legs and feet." (Stat. at 3 n.3 (interim quotations omitted)).

[6]See Stedman's at 134.

Plaintiff underwent an arteriogram aorta femoral assessment, it was determined that he had a one-third long segment occlusion of the left superficial femoral artery. (Id.) "Vascular surgery was consulted." (Id.)

Plaintiff was again seen by Dr. Hampton in October. (Id. ¶ 14.) Dr. Hampton diagnosed Plaintiff with PVD and possible arteriosclerotic cardiovascular disease (ASCVD). (Id.) The treatment plan was to refer Plaintiff to a Dr. Balcer for a stress test to rule out ischemic cardiac disease. (Id.) Dr. Hampton advised Plaintiff that he needed to completely stop smoking before he would be referred to a vascular surgeon. (Id.)

Plaintiff was next seen by Dr. Hampton in February 2003 for complaints of severe calf pain when walking from housing to dining. (Id. ¶ 15.) Plaintiff informed Dr. Hampton that he was still smoking, but he was cutting down. (Id.) Dr. Hampton advised Plaintiff that he had had a discussion with a vascular surgeon, Dr. Ryan, but first Plaintiff had to stop smoking. (Id.)

Dr. Ryan saw Plaintiff in May 2003 for obstruction of his superficial femoral artery. (Id. ¶ 16.) Dr. Ryan advised Plaintiff that he needed to increase his walking to improve circulation and, as had Dr. Hampton, that he must stop smoking before surgery would be considered. (Id.)

The following month, Plaintiff was seen by a nurse, Carol Hamblen, for a routine check-up. (Id. ¶ 17.) He advised her that he smoked approximately one pack of cigarettes per day; that he had seen Dr. Ryan the month before and been told surgery would not be recommended until Plaintiff quit smoking; and that he would quit smoking on July 1, 2003, when it became mandatory that inmates no longer smoke in the housing units. (Id.)

In August 2003, Dr. Hampton requested a referral for Plaintiff to Dr. Balcer for a possible cardiac catheterization and evaluation for possible occult coronary artery disease. (Id. ¶ 18.) It was noted that Plaintiff had a history of shortness of breath without pain on exertion, significant claudication,[7] and PVD. (Id.) Dr. Balcer recommended a cardiac catheterization and aggressive risk factor modifications, including cessation of smoking. (Id.) The catheterization was approved and performed on October 16, revealing that Plaintiff's left heart chamber was normal and had minimal ASCVD. (Id. ¶ 19.) When seeing Ms. Hamblen for a follow-up at the chronic care clinic on October 29, Plaintiff informed her that he smoked approximately fifteen cigarettes a day and had been smoking for thirty-four years. (Id. ¶ 20.)

On June 5, 2004, Dr. Mitsi Faubion requested a referral for an arterial study of Plaintiff's legs based on Plaintiff's history of blockage in the left femoral artery and complaints of claudication. (Id. ¶ 21.) Plaintiff advised the doctor that he smoked three to four cigarettes a day and was not in an exercise program. (Id.) Again, he was advised to stop smoking. (Id.) The arterial study was approved in August; Plaintiff then stated that he no longer smoked and complained of claudication in both legs with walking short distances. (Id. ¶ 22.) Plaintiff underwent an arteriogram in September. (Id. ¶ 23.) Based on the results of that study, Dr. Faubion requested a referral to Dr. Ryan for a vascular surgery consultation. (Id.) The consultation was approved and was held two weeks later. (Id.) Dr. Ryan then recommended (1) angioplasty/stent of Plaintiff's right external iliac artery and (2) left femoral popliteal artery bypass. (Id. ¶ 24.) Both were done in November. (Id. ¶ 25.) Two days

---

[7]"Claudication is pain, tired or weak feeling that occurs in [one's] legs, usually during such activity as walking." Society for Vascular Surgery, Peripheral Arterial Disease (PAD) and Claudication, http://www.vascularweb.org/vascularhealth/pages/peripheral-arterial-disease-(-pad-)-and-claudication.aspx (last visited Sept. 12, 2012).

later, Plaintiff returned to the prison infirmary with a two-day prescription for Darvocet[8] for pain.  (Id.)  After four days, Plaintiff was discharged from the infirmary to his housing unit.  (Id.)

Later that same month, Plaintiff was seen by Dr. Gary Eaton for complaints of a "knot in his leg."  (Id. ¶ 26.)  Dr. Eaton contacted the vascular surgeon to discuss the large mass and then requested a referral to the surgeon for evaluation of the left femoral artery aneurysm and possible arteriogram and revision of the recent femoral popliteal bypass if necessary.  (Id.)  The next day, Plaintiff was seen by Dr. Ryan.  (Id. ¶ 27.)  The examination revealed fluid around the graft; an aneurysm was not clearly seen.  (Id.)  Dr. Ryan recommended a follow-up examination to ensure that the fluid was reabsorbed.  (Id.)

In January 2006, Plaintiff was seen by Dr. William Rice[9] for complaints of severe lower leg pain when walking and of not being able to walk more than fifty yards without having to stop due to pain.[10]  (Id. ¶ 28.)  Plaintiff complained of experiencing intermittent pain since his November 2004 bypass surgery.  (Id.)  Dr. Rice concluded that Plaintiff should be re-evaluated by a vascular surgeon and undergo a Doppler study of the legs.  (Id.)  A referral was requested and approved two days later by Dr. Conley (also named as a defendant).  (Id.)  Plaintiff met in March with Dr. Rice to discuss the results of the Doppler study, which revealed a normal blood flow in the right leg and changes in the left leg

---

[8]Darvocet is a combination of propoxyphene – a narcotic pain reliever – and acetaminophen.  Drugs.com, Darvocet, http://www.medilexicon.com/drugsearch.php?s=Darvocet (last visited Sept. 12, 2012).  It was withdrawn from the United States market in November 2010.  Id.

[9]Dr. Rice is the first of Plaintiff's health care providers to be named as a defendant.  See note 2, supra.

[10]Although paragraph 28 of the uncontroverted material facts provides that Plaintiff complained of not being able to walk fifty feet, the medical records indicate that Plaintiff complained of not being able to walk more than fifty *yards*.  (See Def. Ex. A at 517, ECF No. 58-1.)

consistent with swelling and pain. (Id. ¶ 29.) Consequently, Dr. Rice requested a referral for an arteriogram of Plaintiff's left leg. (Id.) Dr Conley deferred fulfilling this request because Plaintiff continued to use nicotine and to not exercise. (Id.) Dr. Conley recommended that Plaintiff be educated on the effect of continued use of nicotine and the need of an exercise program to increase circulation in his leg. (Id.)

In August,[11] Dr. Cochran requested a Doppler study of Plaintiff's left leg due to a recent onset of swelling and pain after one-hundred feet of walking. (Id. ¶ 30.) A study was soon performed, revealing probable clotting of Plaintiff's prior femoral popliteal bypass. (Id.) Dr. Cochran then requested a referral to a vascular surgeon for consultation. (Id.) The referral was approved and, less than two weeks later, Plaintiff had a vascular consultation with Dr. Ryan about the swelling and pain in his left leg. (Id. ¶ 30-31.) Dr. Ryan concluded that Plaintiff had a decrease in blood supply of the left leg and recommended a formal angiography and left leg re-vascularization. (Id.) These procedures were approved and undergone in October. (Id. ¶ 32.) One day later, Plaintiff was released from the infirmary. (Id.)

Plaintiff was scheduled for a femoral popliteal bypass during the week of November 20. (Id. ¶ 32.) Dr. Ryan found more problems prior to surgery and spoke with Dr. Conley to request additional testing, including a left leg Doppler with exercise AB, and an aortogram with runoffs. (Id.) Both tests were approved by Dr. Conley the next month. (Id.)

In January 2007, Dr. Conley also approved a referral for an aortobifemoral bypass and a left femoral popliteal bypass. (Id. ¶ 34.) On February 5, Plaintiff underwent the aortobifemoral bypass and a left femoral popliteal bypass with a composite reverse

---

[11]Defendants allege in their Statement of Uncontroverted Facts that the request was made on August 18, 2006; medical records reflect it was made two days earlier. (See Defs. Ex. A at 567.)

saphenous vein graft. (Id. ¶ 35.) Five days later, while recuperating in the infirmary, Plaintiff complained of pain and was prescribed Tylenol 3 with codeine. (Id.)

In April, Plaintiff complained of numbness in his left lower extremity. (Id. ¶ 36.) Dr. Roxas, a defendant, concluded Plaintiff had a weak palpable pedal pulse in the left foot and recommended an arterial Doppler of the left lower extremity to rule out re-stenosis. (Id.) The referral request was approved by Dr. Conley; consequently, the procedure was performed two weeks later, revealing some occlusion of the left femoral popliteal artery. (Id. ¶ 37.) Dr. Roxas then recommended a referral to a vascular surgeon, which was approved by Dr. Conley on June 1. (Id.) On June 12, Dr. Roxas recommended another referral to a vascular surgeon for an arterial ultrasound with ABIs of the left lower extremity; this request was also approved by Dr. Conley. (Id.) In August 14, Dr. Roxas requested a referral for an aortogram with runoff prior to vascular surgery for the occlusion; this referral was approved two days later by Dr. Sands, a defendant. (Id. ¶ 38.) The aortogram was performed on August 24, revealing an occlusion of the left femoral popliteal bypass. (Id. ¶ 38.) The surgeon recommended an endovascular approach to re-vascularitize the left lower extremity. (Id. ¶ 39.) On August 28, Dr. Roxas requested the referral of a cardiothoracic specialist for an evaluation, which was approved in two days by Dr. Conley. (Id.)

On September 18, Plaintiff was seen by a cardiothoracic specialist for his PVD and left side swelling and pain. (Id. ¶ 40.) The specialist concluded that Plaintiff had an occluded left femoral popliteal bypass, which had been revealed in the August 24 procedure. (Id.) The specialist recommended that Plaintiff continue on Plavix,[12] begin a walking regimen, and confer with a vascular surgeon at Boone Hospital about approaches to re-

---

[12]Plavix is a platelet inhibitor prescribed for patients with certain coronary problems. Physicians' Desk Reference, 3506-07 (65th ed. 2011).

vascularization.  (Id.)  The specialist requested a follow-up in one month.  (Id.)  On September 19, Dr. Roxas requested a referral for a follow-up visit with the specialist; the request was approved by Dr. Sands on September 25.  (Id. ¶ 41.)  Consequently, Plaintiff saw the specialist for the follow-up visit.  (Id. ¶ 42.)  The specialist recommended an endovascular approach and that Plaintiff continue on Plavix.  (Id.)  He opined that Plaintiff would need an open bypass if the endovascular approach was unsuccessful.  (Id.)  He also recommended a hematology consult for a hypercoagulable evacuation before an endovascular repair was done.  (Id.)  Accordingly, Dr. Roxas requested a referral to a hematologist prior to Plaintiff's endovascular repair.  (Id. ¶ 43.)  Dr. Sands denied the request, recommending instead that Plaintiff have blood work done to determine if he had abnormal levels before a hematology consult was approved.  (Id.)

Dr. Roxas also requested a referral for an endovascular repair of Plaintiff's occluded left SFA (superficial femoral artery); the referral was approved by Dr. Sands that same day. (Id. ¶ 44.)  Plaintiff went to surgery on November 19, but the doctor was unable to place a stent because there was not enough viable vessel for grafting.  (Id. ¶ 45.)  The following day, Dr. Roxas requested a referral for a follow-up consultation with Dr. Joseph Fugaro, the vascular specialist, after the failed stent placement.  (Id. ¶ 46.)  Dr. Sands approved the request.  (Id.)  On November 20, Dr. Roxas renewed his referral request for a hematology consult; Dr. Sands approved the request the next day.  (Id.)  On December 10, Dr. Roxas requested approval for a follow-up appointment for Plaintiff with Dr. Fugaro in three months and for an arterial duplex study of his lower left extremity to be completed before the follow-up appointment with Dr. Fugaro.  (Id. ¶ 47.)  This request was approved by Dr. Conley.  (Id.)

Consequently, Dr. Fugaro saw Plaintiff on March 6, 2008, and concluded that Plaintiff's "life-limiting claudication persist[ed] in [his] left lower extremity" and his compliance with Plavix and Pletal[13] had been "suboptimal in the prison." (Id. ¶ 48; Defs. Ex. A at 697.) Plaintiff's medical records report that he wanted to continue "ambulation and non-operative therapy." (Id.)

On May 12, Dr. Roxas requested a referral to a new vascular specialist at Columbia Surgical Associates to follow Plaintiff's non-surgical treatment.[14] (Defs. Stat. ¶ 49.) The referral was deferred by Dr. Conley, who approved a referral to Dr. Michael See two days later. (Id.) Based on the vascular surgeon's recommendation, Dr. Roxas then requested a referral for an abdominal aortogram and left extremity angiography . (Id. ¶ 50.) This request was deferred by Dr. Conley until Plaintiff's nicotine levels were checked.[15] (Id.) Dr. Roxas requested a referral for a nicotine blood test, which was approved and done. (Id. ¶ 51-52.) The test results were negative. (Id. ¶ 52.) Dr. Roxas then renewed his referral request for the abdominal aortogram and left extremity angiography on July 7; his request was approved by Dr. Conley three days later. (Id. ¶ 53.)

The arteriogram was performed on July 30, after which Plaintiff returned to the prison infirmary that same day with no complaints of pain. (Id.) He returned to his housing unit the next day. (Id.)

_____

[13]Pletal widens the arteries that supply blood to the legs and is used to treat symptoms of intermittent claudication. See Drugs.com, Pletal, http://www.medilexicon.com/drugsearch.php?s=pletal (last visited Sept. 12, 2012).

[14]Dr. Fugaro was moving to Florida.

[15]Exhibits submitted by Plaintiff indicate that a "RMD"would not approve "expensive wu/vascular surgery" before determining whether Plaintiff was still smoking. (Pl. Ex. 9 at [153-54], ECF No. 69.) Plaintiff claimed he had not smoked for two years. (Id. at [154].) (The page numbers are placed in brackets because, as noted above, Plaintiff's medical record exhibits do not include any.)

In September, Dr. Roxas requested a referral to a vascular specialist, Dr. William Sweezer, for a follow-up consultation after the arteriogram. (Id. ¶ 54.) Dr. Conley approved the request seven days later after receiving a copy of the test results. (Id.) After seeing Plaintiff on October 1, Dr. Sweezer concluded that he had 100 percent occlusion (blockage) of the left femoral popliteal bypass and requested authorization to proceed with a left femoral popliteal bypass to improve the blood flow in the left leg. (Id. ¶ 55.) On October 3, Dr. Roxas submitted a request for a referral for the procedure; Dr. Conley approved the request that same day. (Id. ¶ 55.) The left femoral popliteal bypass was performed on October 23. (Id.) Plaintiff was returned to the prison infirmary on October 29. (Id.) Dr. Sweezer's postoperative orders to the infirmary did *not* contain any prescription for insulin and did include an order for a "regular diet." (Id.; Defs. Ex. A at 770-71, ECF No. 58-3.) Plaintiff was prescribed Darvocet for pain and received it throughout his stay at the prison infirmary. (Id.; Defs. Stat. ¶ 56.) He received his last dose of Darvocet when he was discharged from the prison infirmary on November 3. (Id.) He stated that he understood that this was his last dose. (Id.)

On November 4, Dr. Cabrera submitted a request for a referral to Dr. Sweezer for a post-operative follow-up for Plaintiff; the request was approved two days later. (Id. ¶ 57.) Following the appointment on November 21, Dr. Sweezer recommended Plaintiff undergo a computed tomography (CT) angiogram of the abdomen, pelvis, and lower extremities to determine the status of all bypass grafts and native circulation. (Id. ¶ 58.) Dr. Roxas then requested a referral for the procedure, but the referral was deferred by Dr. Sands until Plaintiff completed a nicotine test showing he was no longer using nicotine products. (Id.)

However, on December 8, Dr. Conley approved the request, and a CT scan was performed on December 23.  (Id.)

Plaintiff was seen by Dr. Sweezer on January 23, 2009, for a follow-up appointment. (Id. ¶ 59-60.)   Dr. Sweezer concluded that Plaintiff should have an additional arterial ultrasound study in six months to check the status of the circulation of his legs and also have a follow-up appointment with Dr. Sweezer at that time.  (Id. ¶ 60.)  Six days later, Plaintiff met with Dr. Roxas to discuss Dr. Sweezer's evaluation and recommended treatment plan for Plaintiff's PVD.  (Id.)  In accordance with that plan, Dr. Roxas requested on May 26 a referral to Dr. Sweezer; the request was approved by Dr. Sands three days later.  (Id. ¶ 61.)

Consequently, Plaintiff had an ultrasound of his legs on June 4 and met with Dr. Sweezer on June 16 to discuss the results.  (Id. ¶ 62.)  Plaintiff complained of left thigh pain and right leg swelling; he was given Tylenol and Motrin for the pain.  (Id.)  Dr. Sweezer recommended further procedures and, possibly, a prescription for Darvocet.  (Id.) Dr. Roxas submitted a referral request for the abdominal arteriogram and bilateral femoral runoff; the request was approved by Dr. Conley the same day.  (Id. ¶ 63.)  Plaintiff underwent procedures related to his PVD on July 24, 25, and 26.  (Id. ¶ 64.)  Plaintiff was returned to the prison infirmary on July 29; complained of throbbing pain at his incision sites, and requested pain medication.  (Id. ¶¶ 64, 66.)  He was given acetaminophen; the on-call doctor, Dr. Hakala, was contacted about stronger medication.  (Id.)  Dr. Hakala prescribed a three-day supply of Tylenol with codeine to be administered every four to six hours as needed.  (Id. ¶ 66.)

The next day, Dr. Saffo a defendant, requested a referral for a post-operative appointment with Dr. Sweezer; this request was approved by Dr. Conley.  (Id. ¶ 65.)

Plaintiff saw Dr. Saffo on July 31, reporting that he was feeling okay and was not in pain. (Id. ¶ 67.) On August 1, however, Plaintiff complained of severe pain, requested medication, and was administered several doses of Tylenol 3 with codeine as previously prescribed. (Id. ¶ 68.) He was informed that his prescription expired at midnight and would not be renewed. (Id.) Plaintiff continued to receive acetaminophen. (Id.) He reported on August 3 the pain was getting much better. (Id.) The same day, he was discharged to his housing unit and given a prescription for acetaminophen that could be administered if he experienced any pain. (Id. ¶ 69.)

Plaintiff was examined by Dr. Sweezer on August 18. (Id. ¶ 70.) Dr. Sweezer concluded that Plaintiff's incisions were healed and removed the staples. (Id.) Plaintiff reported that he was still experiencing "considerable pain in multiple incisions." (Defs. Ex. A at 862, ECF No. 58-3.) Dr. Sweezer recommended a follow-up appointment in three months for a re-evaluation of Plaintiff's peripheral artery disease and CT angiograms of his abdomen, pelvis, and lower extremities. (Id. ¶ 70.) Acting on Dr. Sweezer's recommendation, Dr. Saffo requested a referral for the CT angiograms; the request was approved by Dr. Conley. (Id. ¶ 71.)

Three months later, on November 24, Plaintiff had the CT angiograms and the follow-up appointment with Dr. Sweezer. (Id. ¶ 72.) Dr. Sweezer recommended that, in May 2010, an arterial ultrasound of both legs and a bilateral ankle-brachial index be performed and that there be a follow-up appointment. (Id.)

On May 14, 2010, Dr. Saffo requested a referral for the treatment recommended by Dr. Sweezer; his request was approved by Dr. Conley on May 18. (Id. ¶ 73.) The arterial Doppler of the lower extremities was performed in June. (Id.) In July, Plaintiff saw Dr.

Sweezer for follow-up post-vascular surgery visit.  (Id. ¶ 75.)  Dr. Sweezer concluded that Plaintiff's circulation in both legs was adequate.  (Id.)  He recommended a short course of Darvocet and then Advil/Motrin for the leg pain and a repeat arterial study of the legs within a year.  (Id.)

Renal Conditions.  In October  2003, Plaintiff was seen at the MCC chronic care clinic by Dr. Joel Blackburn.  (Id. ¶ 76.)  A urinalysis indicated blood was present in Plaintiff's urine; consequently, Dr. Blackburn recommended an ultrasound of the kidneys to determine if Plaintiff had kidney stones.  (Id.)  Stating that he felt better, Plaintiff refused the ultrasound on November 14.  (Id. ¶ 77.)

Two years later, in October 2005, when confined at NCC, Plaintiff was seen by a nurse, Almeda Denen, for complaints of difficulty urinating.  (Id. ¶ 78.)  Two weeks later, he was seen by Dr. Hurkin for complaints of difficulty urinating, nocturia (urinating at night[16]), a slow stream, and incomplete emptying.  (Id.)  Dr. Hurkin concluded that Plaintiff had an prostatic hypertrophy (an enlarged prostate[17]).  (Id.)  Plaintiff was to have a follow-up consultation in two weeks, which he did, reporting pain in his left flank for the past five days.  (Id. ¶ 78-79.)  Pursuant to Dr. Hurkin's approved request, Plaintiff had flat and upright abdominal x-rays.  (Id. ¶ 79.)

Two weeks later, Plaintiff saw Dr. William Rice, a defendant, for pain in his left abdomen, urinary hesitancy, and pressure and discomfort in his supra-pubic area.  (Id. ¶ 80.)  X-rays revealed a stone in his left ureteral and two stones in the left kidney.  (Id.)  After Dr. Rice's request for a referral to a urologist was approved, Plaintiff was seen by the urologist

_____

[16]Stedman's at 1213.

[17]See Stedman's at 832, 1441.

on December 29, who concluded that Plaintiff had small kidney stones. (Id.) It was unclear, however, whether Plaintiff had ureteral stones; further testing was recommended. (Id.)

On January 5, 2006, Dr. Rice requested a referral for an intravenous pyelogram (IVP).[18] (Id. ¶ 81.) The IVP was approved and performed, revealing bilateral renolithiasis[19] with a mild partial obstruction of the left collecting system. (Id.; Defs. Ex. A at 522, ECF No. 58-1.) The urologist then recommended a cystourethroscopy[20] to remove the left ureteral stone. (Stat. ¶ 81-82.) Plaintiff underwent this procedure on February 6. (Id. ¶ 82.) One week later, after removing a stent placed in Plaintiff at the time of the procedure, the urologist concluded that Plaintiff "should pretty well go back to normal," but might have "a few days of discomfort " (Defs. Ex. A at 529.) The urologist advised Plaintiff he might pass the remaining several smaller kidney stones and the left large stone. (Id.) If not, the urologist recommended extracorporeal shockwave lithotripsy (shock waves used to break up kidney stones[21]). (Stat. ¶ 83.) At Dr. Rice's request, the procedure was approved. (Id.) After undergoing the outpatient procedure the following month, Plaintiff was prescribed Tylenol 1[22] to be taken every four to six hours as needed for pain relief. (Id. ¶ 84.) Also, it

---

[18]The IVP "is a special x-ray examination of the kidneys, bladder and ureters . . . ." Nat'l Inst. of Health, Intravenous pyelogram, http://www.nlm.nih.gov/medlineplus/ency/article/003782.htm (last visited Sept. 12, 2012).

[19]Renolithiasis is the formation of calculi, e.g., "stones," in the kidney. See Stedman's at 260, 989, 1527.

[20]A cystourethroscopy, or cystoscopy, is "[t]he inspection of the bladder by means of a cystoscope," which is a "lighted tubular endoscope." Stedman's at 435.

[21]See WebMD, Kidney Stones Health Center, http://www.webmd.com/kidney-stones/extracorporeal-shock-wave-lithotripsy (last visited Sept. 13, 2012).

[22]Tylenol 1 includes acetaminophen, codeine, and caffeine. See MedBroadcast, Tylenol No. 1, http://www.medbroadcast.com/drug_info_details.asp?brand_name_id=660 (last visited Sept. 13, 2012). It is now only available in Canada. See Urban Dictionary: Tylenol 1,

was recommended that he follow-up with the urologist in two weeks. (Id.) On his return to NCC that same day, Plaintiff denied experiencing any pain or discomfort. (Id.) He was placed in the infirmary for twenty-four hour observation, during which time he asked several times to be go outside to smoke and was told that smoking was not allowed prisoners in the infirmary. (Id.) After examining Plaintiff at the approved follow-up appointment, the urologist concluded that, although a few stone fragments remained in Plaintiff's left kidney, the majority were gone. (Id. ¶ 85.)

At this same appointment, the urologist noted that Plaintiff had some stones in his right kidney and recommended that a lithotripsy be done. (Id.) At Dr. Rice's request, the procedure was approved and performed in May. (Id. ¶ 86.) On return to the infirmary, Plaintiff walked with "a steady gait" and requested pain medication and food. (Defs. Ex. A at 553.) He was given Darvocet to be taken every six hours for pain. (Id.) The nurse's notes indicate that, by 6 o'clock the next morning, Plaintiff was resting quietly and had no complaints of pain or discomfort. (Id.)

At the follow-up visit two weeks later, the urologist noted that, although some of Plaintiff's kidney stones were gone, there was still "a lot of stone material left." (Id. at 554.) He requested that a spiral CT scan be done and suspected that a repeat lithotripsy would be found to be necessary. (Id.) The scan revealed stones in both kidneys. (Stat. ¶ 89.)

In November 2008, Dr. Cabrera, a defendant, submitted a referral request for a urology consult after a CT scan done when Plaintiff was hospitalized for a femoral popliteal bypass operation revealed bilateral kidney stones. (Id. ¶ 90.) Dr. Mignon recommended that the consult be done within two to three weeks; however, Dr. Conley deferred on the grounds

---

http://www.urbandictionary.com/define.php?term=Tylenol%201 (last visited Sept. 13, 2012).

that Plaintiff was asymptomatic and needed an opportunity to recover from his surgery before undergoing additional tests. (Id.)

After a November 2009 CT scan of Plaintiff's abdomen showed kidney stones, Dr. Saffo requested a referral for Plaintiff to be seen by a urologist at Phoenix Urology. (Id. ¶ 91.) Dr. Conley approved this request. (Id.)

In January 2010, Dr. Saffo requested a referral for several procedures related to Plaintiff's kidney stones; Dr. Conley approved this request also. (Id. ¶ 92.) In February, a stent was placed on Plaintiff's right side; Plaintiff was given liquid Tylenol 3 with codeine to be taken as needed for pain. (Id.) In April, Dr. Saffo requested a referral for procedures relating to the stent placement in order to facilitate the dislodging of the kidney stones in Plaintiff's left kidney; Dr. Conley approved that referral within five days. (Id. ¶ 93.) Four days later Plaintiff underwent the procedure, and the next day had a Foley catheter inserted in his urethra to help eliminate waste. (Id.) Seven days later, Plaintiff – pale and dizzy – appeared in the infirmary and informed the nurse on duty that he had removed the Foley catheter on his own and now could not urinate. (Id. ¶ 94.) He was immediately transported to the emergency room for insertion of a new Foley catheter and then taken to the hospital for a blood transfusion. (Id.) The following day, Plaintiff was given a blood transfusion, seen by a urologist, and scheduled for surgery to try to stop the bleeding from his kidney. (Id. ¶ 95.)

Plaintiff returned to the prison on fourteen days after the surgery. (Id.) The urologist recommended a follow-up appointment in four days. (Id.) Dr. Farnham, a defendant, requested the recommended referral; his request was approved the next day. (Id. ¶ 96.)

The following month, Dr. Saffo requested a referral to a different urologist, Dr. Koons, because Plaintiff refused to return to Phoenix Urology and needed to be monitored for his bilateral kidney stones. (Id. ¶ 97.) Dr. Conley approved the referral. (Id.) Subsequently, Plaintiff was seen by Dr. Koons in August; Dr. Koons recommended he return in three months for a follow-up consultation. (Id. ¶ 98.) Dr. Koons also recommended that Plaintiff have a CT scan of his abdomen with and without intravenous (IV) contrast and with no oral contrast prior to his next visit. (Id.) Dr. Saffo requested a referral for recommended procedure. (Id. ¶ 99.) The CT scan was approved and performed within ten days of the request. (Id.)

In addition to his allegations directed at his vascular and renal conditions, Plaintiff takes issue with WMCC's policy on narcotic pain relievers. On April 16, 2010, at his request, Plaintiff met with the director of nursing to discuss his requests for a prescription for Darvocet, Lortab,[23] or other narcotic pain relievers. (Defs. Ex. A at 953, ECF No. 58-4.) The director informed him that the policy was not to allow narcotic pain relievers outside of the infirmary. (Id.) Plaintiff was advised to file a request for a doctor appointment if his current prescriptions and treatment needed to be reevaluated. (Id.)

In their motion for summary judgment, Defendants argue (1) that any claims arising from events occurring more than five years after Plaintiff filed his complaint on October 4,[24]

---

[23]Lortab is a combination of acetaminophen and hydrocodone, an opioid pain reliever. Drugs.com, Lortab, http://www.medilexicon.com/drugsearch.php?s=lortab&search (last visited Sept. 13., 2012).

[24]Defendants incorrectly refer to the complaint as being filed on October 14, 2010. It was docketed on October *4*, 2010. Moreover, because Plaintiff is confined, his complaint is deemed filed when he delivered it to the warden for forwarding to the court. See Sulik v. Taney Cnty., Mo., 316 F.3d 813, 815 (8th Cir. 2003). Although the postmark on the envelope is illegible, Plaintiff signed the filing form on September 29, 2010. Because none of the complained-of events occurred between November 2004, and October 4, 2005, the date Plaintiff gave his complaint to the warden for forwarding is irrelevant.

2010, are time-barred and (2) all claims are without merit.  Plaintiff vigorously opposes the motion.

## Discussion

"Summary judgment is . . . proper 'if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" **Torgerson v. City of Rochester**, 605 F.3d 584, 594 (8th Cir. 2010) (quoting Fed.R.Civ.P. 56(c)(2)).  "The movant 'bears the initial responsibility of informing the . . . [C]ourt of the basis for its motion,' and must identify 'those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact.'" **Id.** (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)) (last two alterations in original).  "If the movant satisfies its burden, the nonmovant must respond by submitting evidentiary materials that 'set out specific facts showing a genuine issue for trial.'" **Id.** (quoting Fed.R.Civ.P. 56(e)(2)).  And "[i]n determining whether summary judgment is appropriate, [the] [C]ourt must look at the record and any inferences to be drawn from it in the light most favorable to the nonmovant." **Id.**  Fed.R.Civ.P. 56(c)(2)).  "The movant 'bears the initial responsibility of informing the . . . [C]ourt of the basis for its motion,' and must identify 'those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact.'" **Id.** (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)) (last two alterations in original).  "If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out 'specific facts showing a genuine issue for trial.'" **Id.** (quoting Celotex Corp., 477 U.S. at 324).  The nonmovant must "explain the legal significance of [his] factual allegations beyond mere conclusory statements importing the appropriate terms of art." **Quinn v. St. Louis Cnty.**,

653 F.3d 745, 752 (8th Cir. 2011). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.'" **Gibson v. Am. Greetings Corp.**, 670 F.3d 844, 853 (8th Cir. 2012) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)). Evidence that is "merely colorable" or "is not significantly probative" is insufficient. **Anderson**, 477 U.S. at 249-50. See also **Barber v. C1 Truck Driver Training, LLC**, 656 F.3d 782, 801 (8th Cir. 2011) ("mere speculation, conjecture, or fantasy" insufficient to defeat summary judgment motion) (internal quotations omitted). Additionally, the requirement that the record be reviewed in the light most favorable to the nonmovant does not require that inadmissible hearsay be considered as evidence. **Novotny v. Tripp Cnty., S.D.**, 664 F.3d 1173, 1178 (8th Cir. 2011). And, as noted above, see note 3, supra, the factual allegations in Defendants' Statement of Uncontroverted Material Facts are deemed admitted based on Plaintiff's failure to comply with Local Rule 4.01E of the Eastern District of Missouri. A party's admissions may be considered when ruling on a motion for summary judgment. See **Wierman v. Casey's General Stores**, 638 F.3d 984, 992-93 (8th Cir. 2011).

Statute of Limitations. It is undisputed that this is a 42 U.S.C. § 1983 action. Section 1983 does not have its own statute of limitations. **Walker v. Barrett**, 650 F.3d 1198, 1205 (8th Cir. 2011). "Nevertheless, the Supreme Court has held that § 1983 claims accruing within a particular state should be governed by that state's statute of limitations governing personal-injury claims." **Id.** In Missouri, a five-year statute of limitations for personal injury

actions is imposed.  **Id.** (citing Mo.Rev.Stat. § 516.120.4).  Accordingly, claims based on actions or omissions before September 2010, see note 24, supra, are time-barred.[25]

Eighth Amendment Deliberate Indifference Standard.  In brief, Plaintiff claims that his Eighth Amendment rights were violated by the delay or denial of necessary medical care.

"It is well established that deliberate indifference to a inmate's serious medical needs is cruel and punishment in violation of the Eighth Amendment." **McCaster v. Clausen**, 684 F.3d 740, 746 (8th Cir. 2012).  "To establish deliberate indifference, 'plaintiffs must prove an objectively serious medical need and that prison officials knew of the need but deliberately disregarded it.'" **Id.** (quoting Nelson v. Corr. Med. Servs., 583 F.3d 522, 531-32 (8th Cir. 2009) (en banc)).  The second part of this test requires more than a showing of negligence by the named individual defendants[26]; rather, it requires a showing of a "mental state . . . 'akin to criminal recklessness.'" **Id.** (quoting Gordon ex. rel. Gordon v. Frank, 454 F.3d 858, 862 (8th Cir. 2006)); accord **Schaub v. VonWald**, 638 F.3d 905, 914-15 (8th Cir. 2011)).  See also **Hartsfield v. Colburn,** 491 F.3d 394, 397 (8th Cir. 2007) ("Deliberate indifference is equivalent to the criminal law standard of recklessness – 'a prison official must both be aware of facts from which the indifference could be drawn that a substantial risk of serious harm exists and he must also draw the inference.'") (quoting Bender v. Regier, 385 F.3d 1133, 1137 (8th Cir. 2004)).  Also, "[d]eliberate indifference must be measured by the official's knowledge at the time in question, not by hindsight's perfect vision." **Schaub**, 638

---

[25]The Court notes that none of the individual defendants treated Plaintiff prior to September 29, 2005. Claim one, however, is based on allegations of events prior to that date and is untimely.

[26]Plaintiff's claims against defendant Correctional Medical Services (CMS) are discussed separately below.

F.3d at 914 (internal quotations omitted). The required knowledge may be shown by circumstantial evidence. **Vaughn v. Gray**, 557 F.3d 904, 908 (8th Cir. 2009).

When, as in the instant case, "the inmate alleges that a delay in medical treatment rises to the level of an Eighth Amendment violation, 'the objective seriousness of the deprivation should also be measured by reference to the *effect* of delay in treatment.'" **Laughlin v. Shriro**, 430 F.3d 927, 929 (8th Cir. 2005) (quoting Beyerbach v. Sears, 49 F.3d 1324, 1326 (8th Cir. 1995)). "To establish this effect, the inmate 'must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment . . . [,]" **id.** (quoting Crowley v. Hedgepeth, 109 F.3d 500, 502 (8th Cir. 1997)) (first alteration in original), unless the medical need would be obvious to a layperson, **Schaub**, 638 F.3d at 914 (finding that new bedsores, some of which were infected and odoriferous, lack of grab bars, inadequate changes of dressings, and no bathing of paraplegic prisoner presented need for medical attention that would be obvious to lay person). Additionally, "[t]he Constitution does not require jailers to handle every medical complaint as quickly as each inmate might wish." **Jenkins v. Cnty. of Hennepin, Minn.**, 557 F.3d 628, 633 (8th Cir. 2009).

To establish an Eighth Amendment violation from the denial of medical care, an inmate must show (a) a "total deprivation of medical care resulted in 'pain and suffering' or 'a lingering death,'" **Lanford v. Norris**, 614 F.3d 445, 460 (8th Cir. 2010) (quoting Estelle v. Gamble, 429 U.S. 97, 103 (1976)), or (b) inadequate medical care rising above negligence, gross negligence, or "'mere disagreement with treatment decisions,'" **id.** (quoting Alberson v. Norris, 458 F.3d 762, 765 (8th Cir. 2006)). Accord **Bender**, 385 F.3d at 1137.

Vascular Conditions. Plaintiff alleges that delays in treating his vascular condition, denial of appropriate pain medication, and a failure to provide him with recommended

accommodations after a surgical procedure displayed deliberate indifference to his serious medical needs.[27]

The record belies that there was any indifference at all. In the thirty months during which Dr. Roxas saw Plaintiff at NCC, he requested a referral nineteen times for either a consultation or a recommended procedure. For instance, Dr. Roxas requested a referral for Plaintiff to have an arterial Doppler study and to have a consultation with a vascular surgeon and with a cardiothoracic specialist. Plaintiff does not cite one instance, nor do the medical records establish one, where Dr. Roxas did not request a referral after one was recommended.[28] Dr. Saffo also requested referrals on Plaintiff's behalf. For instance, he requested a referral for Plaintiff to have a post-operative appointment with Dr. Sweezer and later, acting on Dr. Sweezer's recommendation, requested a referral for Plaintiff to undergo a CT angiogram. During the time period at issue, referrals were requested and approved for Plaintiff to have at least seventeen diagnostic tests, including five Doppler studies and two CT angiograms; undergo five remedial procedures; and consult specialists, including vascular surgeons and cardiothoracic specialists, eighteen times.[29]

---

[27]Plaintiff organizes his amended complaint into fourteen claims that follow the chronological order of his medical treatment, with the exception of a claim against CMS, and nineteen claims that raise Eighth Amendment violations based on that treatment. For ease of reference, the Court will shall address the substance of the claims without attempting to reference Plaintiff's claims by their numbers.

[28]Plaintiff does allege in claim seven that neither Dr. Roxas or Dr. Cabrera treated him for diabetes although his glucose levels were consistently too high. Plaintiff does not establish that he was, at the relevant times, diabetic or that he suffered from any repercussions from the alleged failure of either doctor to treat him for diabetes. "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." **Estelle**, 429 U.S. at 106.

[29]The Court notes that insofar as Plaintiff might claim that Drs. Roxas and Saffo were deliberately indifferent in any of the treatment decisions, his claim would be without merit. See **Bender**, 385 at 1137-38 (holding that defendant physician was not liable for not making treatment decisions after referring inmate to specialist who had made such decisions).

Although the record establishes that the requested referrals were usually expeditiously approved,[30] there were times they were not approved or an approval was denied. Plaintiff challenges these times as violations of his Eighth Amendment rights. Before examining several of Plaintiff's specific challenges to referral decisions, the Court is reminded that "society does not expect that prisoners will have unqualified access to health care," and that "[a]s long as th[e] threshold [of deliberate indifference] is not crossed . . . prison doctors remain free to exercise their independent medical judgment." **Dulany v. Carnahan**, 132 F.3d 1234, 1239 (8th Cir. 1997).

One such time was in March 2006 when Dr. Conley deferred a request for Plaintiff to have an arteriogram of his left leg; the grounds for the deferral were that Plaintiff continued to smoke and to not exercise, against medical advice. Plaintiff argues that this was deliberate indifference and caused a delay resulting in a worsening of his claudication and atherosclerotic disease. The record indicates that Plaintiff was told at least in October 2002; February, May, and September 2003; and June 2004 that he must quit smoking because of his vascular condition. Sometimes, he was also told he must start exercising for the same reason. The record further indicates that Plaintiff was inconsistent about whether he had quit, e.g., he once stated that he would quit on July 1, 2003, and then reported two months later that he was smoking fifteen cigarettes a day and he was still smoking in February 2006. And, five months after that referral request was deferred, a request for a Doppler study of the same leg was approved and performed. A vascular condition is clearly a "sophisticated"[31]

---

[30]Indeed, when the requested referrals were approved, it was always within a few days.

[31]The Eighth Circuit has defined a "sophisticated" injury as one where "proof of causation is not within the realm of lay understanding and must be established through expert testimony," i.e., "requiring surgical intervention or other highly scientific technique for diagnosis." **Turner v. Iowa Fire Equip. Co.**, 229 F.3d 1202, 1210 (8th Cir. 2000).

medical condition. "When an injury is sophisticated, proof of causation generally must be established by expert testimony." **Robinson v. Hager**, 292 F.3d 560, 564 (8th Cir. 2002) (finding that inmate had failed to establish jury issue on question whether lapse in giving inmate hypertension medication had caused stroke because he had not offered any verifying, supporting medical evidence).

Nor does Dr. Conley's deferral of the request for an arteriogram establish the required mental state. This is evident from approval of a left femoral popliteal bypass for Plaintiff the same day it was made.

Also, Dr. Sands once denied a request for a referral and once deferred a request. The denial was of a referral to a hematologist until Plaintiff had bloodwork done to determine whether the referral was necessary. Two months later, Dr. Sands granted a renewed request the day after it was made. The deferral was of a referral for an angiogram and was until Plaintiff completed a nicotine test. The referral was approved when the test came back negative. An inmate cannot defeat a properly supported motion for summary judgment on a deliberate indifference claim "'by merely stating that []he did not feel []he received adequate treatment.'" **Nelson v. Shuffman**, 603 F.3d 439, 449 (8th Cir. 2010) (quoting Dulany, 132 F.3d at 1240). Plaintiff's challenges to Drs. Conley's and Sands' actions are no more than disagreements with their medical decisions. "'[A] prisoner's mere difference of opinion over matters of expert medical judgment or a course of medical treatment fail[s] to rise to the level of a constitutional violation.'" **Id.** (quoting Taylor v. Bowers, 966 F.2d 417, 421 (8th Cir. 1992)) (alteration in original). See also **Vaughn**, 557 F.3d at 909 (an inmate's Eighth Amendment rights are not violated by defendants' refusal "to implement a prisoner's requested course of treatment") (internal quotations omitted).

Plaintiff further argues that several of the decisions to delay approving a request were financially motivated.[32]  This argument fails, however, because Plaintiff has not established any deliberate indifference to his serious medical needs.  See **Williams v. Morrison**, 2012 WL 3283401, *5 (E.D. Mo. Aug. 10, 2012) (granting summary judgment to defendants on inmate's § 1983 claim that defendants' delay in care and in referral to medical specialists, allegedly motivated in party by policy to deny access to medical care to save money, resulted in an injurious delay in treatment of his prostate cancer on grounds inmate had not produced any evidence that any delay rose to level of deliberate indifference).

In one claim, Plaintiff contends that he was discharged from the infirmary by Dr. Farnham against Dr. Sweezer's express instructions and was made to engage in certain exertional activities, e.g., loading cardboard boxes on a cart.  Again, he has failed to show that this labor was deliberate indifference.  Moreover, he alleges only that he was discharged from the infirmary by Dr. Farnham and not that the labor he engaged in was at the direction of any of the named defendants.

"Although multiple contacts with medical personnel do not always preclude a finding of deliberate indifference," **Jolly v. Knudsen**, 205 F.3d 1094, 1097 (8th Cir. 2000), in the instant case, Plaintiff's multiple contacts with medical personnel and specialists establish the lack of any prima facie case of deliberate indifference as to his vascular conditions.

Plaintiff further argues, however, that a failure to give him appropriate pain medication is a violation of his Eighth Amendment rights.  This claim is belied by the record. The record establishes that Plaintiff was given prescribed pain medication while in the

---

[32]Insofar as Plaintiff's financial argument is directed at CMS, it is addressed below.

infirmary following surgery. For instance, when in the infirmary in March 2006,[33] Plaintiff was given Tylenol 1, which has codeine, in response to his complaints of pain; the next day, he denied having any pain. Two months later, when in the infirmary, he requested pain medication and was given Darvocet; by six o'clock the next morning, he had no pain or discomfort. When in the infirmary in October 2008, Plaintiff was prescribed Darvocet and cautioned when the last dosage was given; he stated he understood. When in the infirmary in July 2009, he was given a three-day prescription for Tylenol 3 with codeine after acetaminophen failed to relieve his pain. On the second of the three days, he stated he was okay and not in pain. On the last day, he complained of severe pain, was given Tylenol 3 with codeine, and was cautioned that the prescription would expire at midnight and not be renewed. Two days later, he reported that he was much better. In January 2010, he was given Tylenol 3 with codeine after having undergoing a stent placement.

Although deliberate indifference to an inmate's serious medical needs may be established by prison doctors intentionally interfering with a specialist's prescribed treatment or medication, see **Estelle**, 429 U.S. at 104-05, Plaintiff has failed to show any such interference. His allegations in claim nine that he was denied pain medication prescribed by Dr. Sweezer because of a Missouri Department of Corrections (MoDOC) policy that narcotic pain medications must be given in the infirmary fail to establish an Eighth Amendment violation. See **Steele v. Weber**, 278 Fed.App'x. 699, 700 (8th Cir. 2008) (per curiam) (rejecting inmate's claim that Eighth Amendment rights were violated when prison doctors refused to prescribe him high-dose narcotic pain medication; claim described "mere

---

[33]The March 2006, May 2006, and January 2010 incidents followed procedures for Plaintiff's kidney problems, but are discussed here for ease of reference.

disagreement with course of treatment); **Jones v. Hefner**, 20011 WL 1086059, *5 (E.D. Mo. March 22, 2011) (failure to provide two *pain* medications prescribed by outside physician was not Eighth Amendment violation and was, at best, negligence). Bt cf. **Phillips v. Jasper Cnty. Jail**, 437 F.3d 791, 796 (8th Cir. 2006) (pretrial detainee's allegations that jail employees knowingly failed to give him prescribed *anti-seizure* medication stated deliberate indifference claim).

Nor has he shown, as he alleges, that the pain medication with codeine violated his Eighth Amendment rights because he is allergic to codeine. When Tylenol 1 or 3, both with codeine, were prescribed and taken, Plaintiff reported pain relief, not any allergic reaction. Plaintiff alleges in claim thirteen that CMS nurses ignored that he was allergic to codeine, continued to give it to him, and demanded that he take it. No CMS nurse, however, is named as a defendant.

Renal Conditions. Plaintiff's allegations about the treatment of his renal conditions mirror those about the treatment of his vascular conditions.[34] For instance, in claim twelve, Plaintiff alleges that he was denied the narcotic pain medication, Lortab, prescribed by Dr. Partamian of Phoenix Urology "on at least 6 occasions." This claim is not supported by the record. Moreover, the Court notes that Plaintiff was referred to a different urologist after declining to return to Phoenix Urology.

In claim three of his "constitutional claims," see Amended Complaint at 48-49, Plaintiff alleges that he has a 60 percent loss of left kidney function because of a lithotripsy performed by Dr. Partamian "went wrong" and that Dr. Rice unconstitutionally denied "his right to undergo repeat extracorporeal shockwave lithotripsy surgeries," id. at 48. The

---

[34]At least one claim, claim eleven, merely chronicles Plaintiff's treatment for kidney stones.

allegations of a botched lithotripsy are, at best, an allegation of medical malpractice, see **McRaven v. Sanders**, 577 F.3d 974, 982 (8th Cir. 2009) (claim of medical mistreatment describes medical malpractice and not a cognizable § 1983 claim), and are against a doctor who is not a defendant. The allegations of a right to repeated shockwave lithotripsy surgeries are clearly baseless. Such a right would give Plaintiff, an inmate, a greater right than that enjoyed by a civilian. <u>See</u> **Hines v. Anderson**, 547 F.3d 915, 922 (8th Cir. 2008) ("The Eight Amendment does not guarantee all prisoners medical care commensurate with that enjoyed by the civilian populations.").

<u>CMS.</u> CMS has a contractual agreement with the State of Missouri to provide medical services to correctional institutions. (Stat. ¶ 2.)

Plaintiff contends that pursuant to an unconstitutional policy or custom of CMS (1) needed medical treatment was delayed because he is a smoker; (2) its physicians' decisions on referrals for tests and specialists were financially motivated; and (3) needed narcotic pain medication was not given unless he was in the infirmary.

To establish a deliberate indifference claim against CMS, Plaintiff "must show that there was a policy, custom, or official action that inflicted an actionable injury." **Johnson v. Hamilton**, 452 F.3d 967, 973 (8th Cir. 2006). To prove a custom, Plaintiff must show "a continuing, widespread, persistent pattern of unconstitutional misconduct" by CMS employees. **S.J. v. Kansas City Mo. Pub. Sch. Dist.**, 294 F.3d 1025, 1028 (8th Cir. 2002) (internal quotations omitted).

Plaintiff's smoking claim fails because he has not produced any evidence that a denial or deferral of a referral request was motivated by any consideration other than medical ones.

There is but one deferral or denial properly before the Court.[35] This is the one in March 2006 when Dr. Conley deferred a request for a referral for an arteriogram of Plaintiff's left leg on the grounds he was continuing to use nicotine. Other referrals for other procedures, including, for example, Doppler studies, femoral popliteal bypasses, x-rays, and pyelograms, were approved. A referral for a specialist was never denied on the grounds that Plaintiff was smoking. Plaintiff's smoking claim fails for want of supporting evidence.

Plaintiff's claim that CMS physicians' decisions were financially motivated fails for the same reason. Even a cursory reading of Plaintiff's medical history establishes that he was consistently referred to outside specialists and for diagnostic and remedial tests and procedures. In support of his claim, Plaintiff submits the deposition of Gary H. Campbell, D.O., produced in the case of **James Hill v. CMS**, 4:02cv0646 CDP (E.D. Mo. Jan. 9, 2004) (claim for deliberate indifference based on allegations of failure to approve referral for orthopedic specialist within reasonable time).[36] His reliance on this deposition is unavailing for several reasons. First, the time period in question was 1998 to 1999, well before the time period now before the Court. (See Pl. Ex. 2 at 9-10, 18, ECF No. 69.) Second, nothing in the deposition suggests that any decision made about Plaintiff's medical conditions was unconstitutionally financially motivated. Although Dr. Campbell testified that expenses associated with care provided to an inmate "could" affect CMS' budget and, therefore, its

---

[35]The Court notes that the other deferrals or denials were made outside the statute of limitations period.

[36]In their reply brief in support of their motion for summary judgment, Defendants argue that the several affidavits and Dr. Campbell's deposition testimony should be stricken for failure to comply with the Federal Rules of Civil Procedure. The Court finds it not necessary to reach this argument. The affidavits of the three inmates, Plaintiff's Exhibits 4, 5, and 6, about personally observing Plaintiff's pain are irrelevant and, insofar as they each aver that they were aware of Plaintiff's repeated requests to unnamed nurses and physicians for referrals, are inadmissible hearsay or irrelevant, as is the affidavit of Plaintiff's friend, Plaintiff's Exhibit 23.

decisions on bonuses, he also testified that his salary and bonuses were not in affected by outside referrals he approved; he was never pressured or constrained by CMS as to his referrals to outside specialists; and, had there been such pressure, he would never allow himself to be affected by such. (Id. at 22-24.)

Plaintiff's argument about the narcotic pain medication restriction fails because the record establishes (a) it was MoDOC's policy, not CMS', and (b) it did not inflict an actionable injury.[37]

<u>**Conclusion**</u>

Plaintiff presents a detailed medical history giving rise to overlapping claims. He has failed, however, to present sufficient evidence to "'clear [the] substantial evidentiary threshold to show that the prison's medical staff deliberately disregarded [his] inmate's needs by administering an inadequate treatment.'" **McRaven**, 577 F.3d at 980 (quoting Meuir v. Greene Cnty. Jail Employees, 487 F.3d 1115, 118 (8th Cir. 2007)).

Accordingly, for the foregoing reasons,

---

[37]The Court notes that a policy of not allowing prisoners in the general population access to narcotic pain relievers is not clearly without a legitimate penological basis. In 2006, 21.3% of Missouri prisoners had been convicted of drug-related offenses; in 2009, it was 18.4%, and in 2010, 17.4%. See Mo. Dep't of Corrs., Inside Out, http://doc.mo.gov/documents/publications/Inside_Out_201009.pdf (last visited Sept. 18, 2012); Mo. Dep't of Corrs., A Profileof the Institutional and Supervised Offender Population on June 30, 2011, http://doc.mo.gov/documents/publications/Offender%20Profile%20FY11.pdf (last visited Sept. 18, 2012).

**IT IS HEREBY ORDERED** that the motion for summary judgment by Correctional Medical Services; Elizabeth Conley; William E. Rice; Glen S. Babich; Michael E. Sands; Dr. Gene P. Roxas; Dr. Tomas V. Cabrera; Dr. Karl Saffo; and Dr. Milo Farnham is **GRANTED**.  [Doc. 56]

An appropriate Judgment shall accompany this Memorandum and Order.

/s/  Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  18th day of September, 2012.